**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MAUREEN BROPHY and CHRISTOPHER
BROPHY on behalf of their son, C.B., a minor,
and their daughter, M.B., a minor,
and individually on their own behalf,

Plaintiff,

v.

EAST PENN SCHOOL DISTRICT; KRISTEN
CAMPBELL, in her individual and official
capacity; KATE KIERES, in her individual and
official capacity; ERIN MURPHY, in her
individual and official capacity; CAROLE
WILSON, in her individual and official
capacity; and LINDA PEKARIK, in her
individual and official capacity.

Defendants.

Civil Action No.

**COMPLAINT**

**PLAINTIFFS DEMAND A
TRIAL BY JURY**

Plaintiffs, Maureen Brophy and Christopher Brophy, on behalf of their son, C.B, a minor, and their daughter M.B., a minor, and individually on their own behalf, by and through their attorneys, Derek Smith Law Group, PLLC, bring this Complaint against the East Penn School District and in support thereof, aver as follows:

**<u>INTRODUCTION</u>**

1.     Plaintiffs Maureen Brophy and Christopher Brophy's (hereinafter "Plaintiffs") minor children, C.B. and M.B., like all public-school students attending federally funded institutions, had a statutory and constitutional right to equal access to their institution's educational opportunities. Defendants East Penn School District (hereinafter "EPSD"), Emmaus High School, Kristen Campbell, Dr. Kate Kieres, Erin Murphy, Carole Wilson, and Dr. Linda Pekarik, and all who had actual knowledge of the severe and pervasive

harassment and retaliation to which Plaintiff and Plaintiff's minor children were subjected, created a hostile environment when they failed to appropriately address the harassment and retaliation.

2.      By acting with deliberate indifference to that knowledge, Defendants deprived Plaintiffs' minor children of their constitutional rights in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et. seq., as more fully set forth herein.

3.      Plaintiffs also brings this action to redress the deprivation of Plaintiffs' constitutional rights under the First and Fourteenth Amendments of the United States Constitution.

4.      Plaintiffs brings this action for redress under statutory violations of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1331, which gives district court's jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

6.      This court has jurisdiction in that this action involves a Federal Question.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b), since Defendant East Penn District and Emmaus High School are located in this judicial district and all or a substantial part of the events which give rise to the claim herein occurred in this district.

## **PARTIES**

8.      Plaintiff C.B., is a minor child who has resided at all relevant time in Macungie, Pennsylvania, and who at all relevant times, had been a student attending Emmaus High School within the East Penn School District.

9.      Plaintiff, C.B., is presently a sixteen (16) year-old resident of Lehigh County.

10.     Plaintiff M.B., is a minor child who has resided at all relevant time in Macungie, Pennsylvania, and who at all relevant times, had been a student attending Emmaus High School within the East Penn School District.

11.     Plaintiff, M.B., is presently a fifteen (15) year-old resident of Lehigh County.

12.     The minor Plaintiffs are referred to herein as Plaintiff C.B. and M.B. due to their age and the extreme hardship such revelation of their identity would cause and the need to protect minor children.

13.     The identity of the minor Plaintiffs are known to Defendants and minor Plaintiffs will be made available for any and all court proceedings.

14.     Plaintiffs Maureen Brophy and Christopher Brophy (hereinafter referred to as "Plaintiff Mother", "Plaintiff Father" respectively) (hereinafter "Plaintiff Parents" collectively) bring this action on behalf of their son, C.B, a minor, and their daughter M.B., a minor, and individually on their own behalf.

15.     At all times material, Plaintiff Parents were residents of the County of Lehigh, in the Commonwealth of Pennsylvania, in the Eastern District of Pennsylvania.

16.     Defendant East Penn School District (hereinafter "Defendant EPSD") is a governmental entity receiving Federal financial assistance, located in the County of Lehigh

within the Commonwealth of Pennsylvania, which provides free public education to students in the Lehigh Valley area.

17.     Emmaus High School (hereinafter referred to as "EHS") is, and was at all relevant times, a high school within the EPSD.

18.     At all times material, Kristen Campbell (hereinafter referred to as "Defendant Campbell"), was the Superintendent of EPSD.

19.     In that capacity, Defendant Campbell was the chief administrator of the EPSD and was responsible for carrying out the rules, policies and procedures as established by the EPSD and supervised all employees within the EPSD including but not limited to EHS.

20.     Defendant Campbell is being sued in her individual capacity and in her supervisory capacity as Superintendent of EPSD.

21.     At all times relevant to the instant Complaint, Defendant Campbell was acting under color of State law and was engaged in the course and scope of her employment as an employee, agent and official of Defendant EPSD.

22.     Furthermore, at all times relevant Defendant Campbell acted or failed to act within the scope, course, and authority of her employment and her employer, and in her individual capacity.

23.     At all times material, Dr. Kate Kieres (hereinafter referred to as "Defendant Kieres"), was the Principal of EHS.

24.     In that capacity, Defendant Kieres was the chief administrator of the EHS and was responsible for carrying out the rules, policies and procedures as established by the EPSD and supervised all employees within EHS.

25.     Defendant Kieres is being sued in her individual capacity and in her supervisory capacity as Principal of EHS.

26.     At all times relevant to the instant Complaint, Defendant Kieres was acting under color of State law and was engaged in the course and scope of her employment as an employee, agent and official of Defendant EPSD.

27.     Furthermore, at all times relevant Defendant Kieres acted or failed to act within the scope, course, and authority of her employment and her employer, and in her individual capacity.

28.     At all times material, Erin Murphy (hereinafter referred to as "Defendant Murphy"), was the Humanities Supervisor within Defendant EPSD.

29.     In that capacity, Defendant Murphy was responsible for carrying out the rules, policies and procedures as established by the EPSD and EHS.

30.     Defendant Murphy is being sued in her individual capacity and in her supervisory capacity as Humanities Supervisor within Defendant EPSD.

31.     At all times relevant to the instant Complaint, Defendant Murphy was acting under color of State law and was engaged in the course and scope of her employment as an employee, agent and official of Defendant EPSD.

32.     Furthermore, at all times relevant Defendant Murphy acted or failed to act within the scope, course, and authority of her employment and her employer, and in her individual capacity.

33.     At all times material, Carole Wilson (hereinafter referred to as "Defendant Wilson"), was an AP Physics teacher within Defendant EPSD.

34.     In that capacity, Defendant Wilson was responsible for carrying out the rules, policies and procedures as established by the EPSD and EHS.

35.     Defendant Wilson is being sued in her individual capacity and in her supervisory capacity an AP Physics teacher within Defendant EPSD.

36.     At all times relevant to the instant Complaint, Defendant Wilson was acting under color of State law and was engaged in the course and scope of her employment as an employee, agent and official of Defendant EPSD.

37.     Furthermore, at all times relevant Defendant Wilson acted or failed to act within the scope, course, and authority of her employment and her employer, and in her individual capacity.

38.     At all times material, Linda Pekarik (hereinafter referred to as "Defendant Pekarik"), was the Director of Special Education for Defendant EPSD.

39.     In that capacity, Defendant Pekarik was responsible for carrying out the rules, policies and procedures as established by the EPSD and EHS.

40.     Defendant Pekarik is being sued in her individual capacity and in her supervisory capacity as Director of Special Education for Defendant EPSD.

41.     At all times relevant to the instant Complaint, Defendant Pekarik was acting under color of State law and was engaged in the course and scope of her employment as an employee, agent and official of Defendant EPSD.

42.     Furthermore, at all times relevant Defendant Pekarik acted or failed to act within the scope, course, and authority of her employment and her employer, and in her individual capacity.

## APPLICABLE LAW AND POLICY

43.      Title VI of the Civil Rights Act, 42 U.S.C. § 2000(a), states that

All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

44.      Federal Courts have construed Title VI to cover religious discrimination where "the harassment is based on the group's actual or perceived shared ancestry or ethnic characteristic, rather than solely on its members' religious practice." *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 355 (S.D.N.Y. 2014).

45.      Several Presidents have recognized that Title VI protections may not exclude religious discrimination when the victim is a member of a group that shares common religious practices. *See* Executive Order No. 13899; Executive Order No. 13160.

46.      The First Amendment to the United States Constitution provides in pertinent part that "Congress shall make no law … prohibiting the free exercise thereof; or abridging the freedom of speech." U.S. Const. Amend. I.

47.      The Fourteenth Amendment to the United States Constitution provides in pertinent part that no State shall, "deny to any person within its jurisdiction the equal protection of the laws" U.S. Const. amend. XIV, § 1.

48.      § 504 of the Rehabilitation Act of 1973 provides: "No otherwise qualified individual . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."

49.      Title II of the Americans with Disabilities Act of 1990 provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from

participation in or be denied the benefits of the services, programs, or activities of a public

entity, or be subjected to discrimination by any such entity."

50.     Defendant EPSD has also adopted anti-discrimination policy which states,

"[Defendant EPSD] shall not discriminate in their academic programs, activities or

employment practices based on gender, race, color, national origin, sex, sexual orientation,

disability, age, **religion** or any other legally protected classification."

51.     That policy, Policy 103: Discrimination…Affecting Students, "declares it to be the

policy of [Defendant EPSD] to provide an equal opportunity for all students to achieve

their maximum potential through the programs and activities offered in the schools without

discrimination on the basis of race, color, age, creed, **religion**, sex, sexual orientation,

gender identity, ancestry, national origin, marital status, pregnancy or handicap/disability

52.     The policy defines "harassment" as, "a form of discrimination based on the

protected classifications listed in this policy consisting of unwelcome conduct such as

graphic, written, electronic, verbal or nonverbal acts including offensive jokes, slurs,

epithets and name-calling, ridicule or mockery, insults or put-downs, offensive objects or

pictures, physical assaults or threats, intimidation, or other conduct that may be harmful or

humiliating or interfere with a person's school or school-related performance when such

conduct is/;

   a.   Sufficiently severe, persistent or pervasive; an

   b.   A reasonable person in the complainant's position would find that it creates an

        intimidating, threatening or abusive educational environment such that it deprives

        or adversely interferes with or limits an individual or group of the ability to

participate in or benefit from the services, activities or opportunities offered by a school.

53.     The policy also states that students and third parties who believe they or others have been subject to discrimination or retaliation to, "promptly report such incidents to the building principal, even if some elements of the related incident took place or originated away from school grounds, school activities or school conveyances. A person who is not an intended victim or target of discrimination but is adversely affected by the offensive conduct may file a report of discrimination."

54.     The reports of discrimination may also be made by, "student's parents/guardians or any other person with knowledge of conduct that may violate this policy," per the policy.

55.     The policy confers a duty to, "immediately report the incident to the building principal, as well as properly making any mandatory police or child protective services reports required by law," upon any, "[Defendant EPSD] employee who suspects or is notified that a student has been subject to conduct that constitutes a violation of this policy."

56.     When a principal within Defendant EPSD, "is the subject of a complaint, the student, third party or a reporting employee shall report the incident directly to the Compliance Officer/Title IX Coordinator."

57.     Per the policy, a principal within Defendant EPSD, "shall promptly notify the Compliance Officer/Title IX Coordinator of all reports of discrimination … or retaliation. The Compliance Officer/Title IX Coordinator shall promptly contact the complainant regarding the report to gather additional information as necessary, and to discuss the availability of supportive measures. The Compliance Officer/Title IX Coordinator shall consider the complainant's wishes with respect to supportive measures.

58.     The Compliance Officer/Title IX Coordinator shall conduct an assessment to determine whether the reported circumstances are most appropriately addressed through the Discrimination Complaint Procedures … or if the reported circumstances meet the definition of Title IX sexual harassment and are most appropriately addressed through the Title IX Sexual Harassment Procedures and Grievance Process for Formal Complaints … or other Board policies."

59.     The policy also, "prohibits retaliation by [Defendant EPSD] or any other person against any person for:

   **a.**   Reporting or making a formal complaint of any form of discrimination or retaliation, including Title IX sexual harassment.

   **b.**   Testifying, assisting, participating or refusing to participate in a related investigation, process or other proceeding or hearing.

   **c.**   Acting in opposition to practices the person reasonably believes to be discriminatory."

60.     Defendant EPSD and, "its employees and others are prohibited from intimidating, threatening, coercing, or discriminating against anyone for actions described above. Individuals are encouraged to contact the Compliance Officer/Title IX Coordinator immediately if retaliation is believed to have occurred."

## STATEMENT OF FACTS

61.     At all times material, Defendant East Penn School District was receiving federal funding, as contemplated by Title VI.

62.     Defendant EPSD implemented and executed policies and customs regarding the events that resulted in the deprivation of Plaintiffs' constitutional, statutory, and common-law rights.

63.     At all times relevant, Emmaus Highschool was a public school within the Defendant EPSD.

64.     At the time of the events which gave rise to this Complaint, Plaintiff C.B. was 16 years of age, Plaintiff M.B. was 15 years of age, and both were enrolled at Emmaus Highschool.

65.     In September 2020, Plaintiffs C.B. and M.B. were introduced to the book "White Fragility" that was being taught within their courses.

66.     On September 17, 2020, Plaintiff Mother sent an email to Anthony Moyer, a principal at Willow Lane Elementary School in EPSD, and Defendant Murphy regarding the use of the book "White Fragility" as well as the discussions of white privilege and "Black Lives Matter" and explained her non-acceptance of these discussions within school due to the Black Lives Matter Organization's hostility towards Christianity.

67.     Plaintiff Mother further explained concerning social media posts that she had come across on Matthew Weimann's (herein after "Mr. Weinmann"), an elementary school teacher at Defendant EPSD, Facebook page. These social media posts were anti-Christian, anti-Conservative, and therefore, offensive, derogatory, and discriminating against Plaintiffs' religious beliefs.

68.     On September 21, 2020, Plaintiff Mother received a response to her September 17, 2020, email from Defendant Murphy.

69.     Defendant Murphy indicated that "White Privilege and Black Lives Matter are not a part of our [Defendant EPSD] core curriculum" and that "White Fragility is not part of our [Defendant EPSD] required curriculum nor was it used for district professional development."

70.     Defendant Murphy did not address the complaint Plaintiff Mother had made regarding the discriminatory posts found on Mr. Weimann's social media.

71.     On September 30, 2020, Plaintiff Mother sent an additional email to a representative of Defendant EPSD regarding the anti-Christian and anti-Conservative posts being made by Mr. Weimann on his social media page and officials of Defendant EPSD ignoring her concerns. Plaintiff Mother attached copies of the discriminatory posts she was referring to within her email correspondence.

72.     On October 13, 2020, Defendant Campbell, sent a letter to Plaintiff Mother and stated, "Teachers have a First Amendment Right to speak on matters of public concern so long their speech is made as a private citizen and does not contain statements that are knowingly false or recklessly made." Ms. Campbell went on to state that she intended to take no action regarding this matter.

73.     On October 14, 2020, Plaintiff Mother sent a letter to Defendant Campbell outlining the fact that volunteers within the Defendant EPSD had to sign a social media agreement and indicate that they would use social media "responsibility." However, a salaried teacher, who posts aggressive, offensive, and discriminatory anti-Christian and anti-Conservative statements on social media, is not held to the same standard.

74.     Plaintiff Mother further indicated within her letter that on his social media, Mr. Weimann indicates that he works within Defendant EPSD and that he is an elementary

teacher. Plaintiff Mother explained that his anti-Christian and anti-Conservatism posts reflect Defendant EPSD and that he needs to be held responsible for his discriminatory posts.

75.     On October 14, 2020, Plaintiff Parents sent an additional letter to Defendant Campbell regarding videos of police brutality and the Breonna Taylor case being shown within an art class at Defendant EPSD.

76.     Within the correspondence, Plaintiff Parents indicated that there are better examples that can be used within the classroom to demonstrate advocacy.

77.     Plaintiff Mother and Plaintiff Father further indicated that the use of topics within their children's classroom such as "systematic racism," "white fragility," "religion," "white privilege," "Black Lives Matter, and "police brutality," were not acceptable and would not be tolerated.

78.     Plaintiff Parents explained that these topics are anti-Christian and therefore, discriminate directly against their religion.

79.     Christians and Catholics are a majority white religion, self-identifying white Catholics comprising 60% of the followers. This religion is heavily tied to Italy, whose population is 80% Catholic and home to the Vatican.

80.     On October 16, 2020, Plaintiff Mother received correspondence from Defendant Kieres acknowledging receipt of Plaintiff Parent's October 14, 2020, correspondence. Defendant Kieres informed Plaintiff Parents that follow up communication would be from Defendant Campbell.

81.     Plaintiff Mother responded on this date to indicate that she and Plaintiff Father are

opting Plaintiff C.B. and Plaintiff M.B. out of the curriculum regarding the topics

outlined within her October 14, 2020, correspondence.

82.     Plaintiff Mother and Plaintiff Father opted out of the curriculum on behalf of their

children due to the fact the anti-Christian and anti-Conservatism topics were directly

discriminating against the family and their religious beliefs.

83.     As a direct result of Plaintiff Mother and Plaintiff Father expressing their

concerns with Defendant EPSD's curriculum discriminating against their religion,

Defendant EPSD began to retaliate and further discriminate against Plaintiff C.B. and

Plaintiff M.B., withholding crucial educational benefits on account of their disabilities.

84.     Prior to Plaintiff Mother's complaints about the anti-Christian, anti-white

curriculum in the school, Plaintiffs C.B. and M.B. did not receive discriminatory

treatment on the basis of their disabilities.

85.     Plaintiff C.B. and Plaintiff M.B. both received regular Individualized Education

Programs (IEPs) due to their disabilities.

86.     Plaintiff C.B. has several health issues including Hypersomnolence, Chronic

Fatigue Syndrome, and Amplified Musculoskeletal Pain Syndrome (AMPS).

87.     On September 22, 2020, prior to Plaintiff Parents expressing their concerns on the

discriminatory curriculum, a revision meeting for an IEP in regard to Plaintiff C.B. was

held.

88.     During this meeting, it was outlined within Plaintiff C.B.'s IEP that he was

exempt from wearing a mask due to his underlying health conditions.

89.     The school year started online due to the coronavirus pandemic, which forced the
students to endure dramatically increased screen time.

90.     Additionally, Plaintiff C.B. was informed that the school would print his
schoolwork in order to reduce screen time for his vision impairment that caused pain, eye
drift, and headaches, all of which are worsened by a significant amount of time on a
computer screen.

91.     As a result of Plaintiff Parent's opposition to the religious discrimination,
Defendants failed to adequately print out Plaintiff C.B.'s schoolwork.

92.     Furthermore, Defendants failed to provide reasonable alternative means for
Plaintiff C.B. to obtain paper copies of his schoolwork.

93.     The IEP for Plaintiff C.B. also outlined that a homebound tutoring service would
be put in place in order to further avoid screen time. However, it was noted that there was
no AP Physics tutor available, a class in which he was enrolled in.

94.     As a result of Plaintiff Parents' opposition to the religious discrimination,
Defendants failed to make a reasonable attempt, or any attempt, to locate a suitable
homebound tutoring service for Plaintiff C.B.

95.     On October 22, 2020, Plaintiff Mother was made aware that Defendant Wilson,
would return to in person instruction at Emmaus Highschool, however, she refused to do
in person instruction with Plaintiff C.B. as he would not be wearing a mask, although he
is exempt from doing so per his IEP.

96.     On October 23, 2020, Plaintiff Mother and Plaintiff Father sent a letter to
Defendant Kieres, addressing their concerns that their son was being discriminated
against for his disability. She indicated that his IEP states he is not required to wear a

mask due to his disability and that if Defendant Wilson is not comfortable with that, then she should not be teaching any students in person whatsoever.

97.     Upon information and belief, Plaintiff C.B. is the only student that Defendant Wilson refused to teach in person.

98.     As a result of the discrimination based on Plaintiff C.B.'s disability, Plaintiff Mother submitted an Educator Misconduct Complaint Form with the Pennsylvania Department of Education as well as a Complaint with the Office for Civil Rights on October 26, 2020.

99.     On October 27, 2020, Plaintiff Mother sent various emails to Defendant Pekarik, regarding Defendant Wilson's refusal to abide by Plaintiff C.B.'s IEP.

100.    Defendant Pekarik's options to Plaintiff Mother, in order to resolve the issue with Defendant Wilson refusing to follow the IEP, were to (a) have Plaintiff C.B. take AP Physics during the next school year, 2021-2022, instead of 2020-2021, which he was currently enrolled in; (b) enroll Plaintiff C.B. in a college-level physics course during the second semester of the 2020-2021 school year; or (c) enroll Plaintiff C.B. in a college-level physics course during the Summer of 2021.

101.    All of the options presented to Plaintiff Mother would either put Plaintiff C.B. a year behind his classmates or were unfeasible due to Plaintiff's C.B.'s disabilities. These options would have been sufficient for a student without Plaintiff C.B.'s disabilities, but placed Plaintiff C.B. at a disadvantage because the school failed to consider his need for reduced screen time.

102.    Defendant Pekarik further explained that since all options had been deemed unacceptable and unfeasible by Plaintiff Mother, Ms. Wilson would provide instructions

for Plaintiff C.B. via Zoom and Mr. Bradley (First Name Unknown), would be in the room with Plaintiff C.B. if he needed assistance.

103.      Mr. Bradley was not a certified Physics teacher and would therefore, be unable to provide the necessary help that Plaintiff C.B. would require.

104.      Plaintiff Mother responded to Dr. Pekarik and suggested that as opposed to discriminating against Plaintiff C.B. and not abiding by his IEP, Defendant EPSD could place Ms. Wilson in a larger classroom, provide her with an N95 mask, place her in a proper HVAC room, or have another Physics teacher instruct Plaintiff C.B. that would abide by his IEP.

105.      Plaintiff Mother further indicated that this is not only a direct violation of his IEP by refusing to teach him without a mask but also by requiring him to learn via Zoom. Plaintiff C.B.'s IEP specifically states that he is to do homebound learning as he has medical issues with his vision that cause severe pain, eye drift, and headaches when he is looking at a computer screen for too long.

106.      Plaintiff C.B. was unfairly discriminated against and thus, forced into a hostile educational environment.

107.      On October 28, 2020, Plaintiff Mother received a letter from Ms. Campbell indicating that they are working on finding a solution for Plaintiff C.B. regarding AP Physics.

108.      On October 29, 2020, Plaintiff Mother responded to Ms. Campbell's October 28, 2020, correspondence. Plaintiff Mother indicated that in August of 2020, Ms. Campbell was made aware of the situation with AP Physics. Additionally, Plaintiff Mother was not

made aware that Plaintiff C.B. being medically exempt from wearing a mask was still an issue until October 22, 2020, the Thursday before hybrid learning was to begin.

109.    Within the correspondence, Plaintiff Mother also indicated that they had been repeatedly asking for an emergency IEP Meeting starting on October 23, 2020. Plaintiff Mother stated that Plaintiff C.B.'s physician had also sent a letter to Defendant EPSD officials requesting an IEP Meeting.

110.    In January of 2021, Plaintiff Parents signed an Agreement to Participate in Facilitated Resolution Between the Parties (FRBP) in order to address the issues that Plaintiffs' have had with Defendant EPSD and Plaintiff C.B and Plaintiff M.B.'s IEPs.

111.    A meeting was set to be scheduled on February 3, 2021; however, Plaintiff Mother and Plaintiff Father did not attend.

112.    On the morning of February 3, 2021, Plaintiff Parents received a document that was unacceptable and incorrect as provided by Defendant EPSD.

113.    Plaintiff Parents were in correspondence with Mr. Remaly (First Name Unknown), Case Manager for Plaintiff C.B. and Plaintiff M.B., regarding their concerns with the document that was provided to them. They were unable to reach an agreement and as such, Plaintiff Parents asked that Mr. Remaly relay their position to the officials of Defendant EPSD and indicate that they would not sign the document.

114.    On February 8, 2021, Plaintiff Parents received a letter from an employee at Defendant EPSD indicating that Plaintiff C.B. had five unexcused absences. As opposed to addressing the absences and asking why Plaintiff C.B. was absent, the letter indicated that legal action may be necessary as a series of unexcused absences constitutes a summary offense under the Public-School Code.

115.     This is a clear example of how Defendant EPSD was harassing and retaliating

against Plaintiffs for expressing their concern of discrimination within Defendant EPSD.

116.     On February 19, 2021, Plaintiff Parents received a response from Ms. Campbell

regarding their October 2020 correspondence requesting that Plaintiff C.B. and Plaintiff

M.B. be exempt from curriculum relating to "systematic racism, white fragility, religion,

white privilege, Black Lives Matter, police brutality and politics" as these topics were

offensive to their religious beliefs.

117.     Ms. Campbell denied their request for exemption on the grounds that their

"blanket request is not aligned with Board Policy 105.2, Exemption from Instruction."

118.      Ms. Campbell further instructed Plaintiff Parents that they are banned from

communicating with their children's teachers and any Defendant EPSD employee. They

were only permitted to communicate with Dr. Pekarik regarding any issues that they may

have.

119.     As a result of Defendant's actions, Plaintiffs felt degraded, victimized,

embarrassed, and emotionally distressed.

120.     On February 19, 2021, Plaintiff Parents sent a letter to Ms. Campbell regarding

the denial of their request for exemption of controversial topics to be taught to their

children. Plaintiff Parents stated that such topics "do not coincide with [their] moral

compass or conservative religious views."

121.     Plaintiff Parents indicated that they are simply seeking religious exemption from

the topics that are anti-Christian and anti-Conservative.

122.     Plaintiffs were being religiously discriminated against by being denied their request to have their children exempt from a curriculum that directly goes against their religious beliefs.

123.     On February 23, 2021, Plaintiff Mother received an email from Dr. Pekarik that Plaintiff C.B. had missed several assignments within English and Biology and that his grades were impacted because of this.

124.     Plaintiff Mother responded to Dr. Pekarik and indicated that the teachers need to communicate with the parents when students start to fall behind. Additionally, Plaintiff Mother indicated that this would not be an issue if she and Plaintiff Father were not banned from communicating with the teachers directly.

125.     The online learning circumstances created an environment where communication between the students' teachers and the students' parents at home with them is critical and denying the parents any communication opportunities severely hampered Plaintiffs C.B. and M.B.'s learning, ability to complete assignments, and information on assignments missing.

126.     Plaintiff Parents being banned from communicating with Plaintiff C.B. and Plaintiff M.B.'s teachers, denied Plaintiff C.B. and Plaintiff M.B equal education opportunities.

127.     On March 15, 2021, Plaintiff Mother emailed Dr. Pekarik that Plaintiff M.B. was not able to understand her assignments in her Spanish class.

128.     Dr. Pekarik indicated that she would obtain further information on the assignments from Plaintiff M.B.'s Spanish teacher and relay the information to Plaintiff Mother.

129.     Plaintiff Mother was forced to use Dr. Pekarik as a middleman as opposed to speaking to the Spanish teacher directly to better understand the assignments and to see how Plaintiff M.B. was doing in class due to the ban that Defendant EPSD placed on Plaintiff Mother and Plaintiff Father.

130.     This ban was an act of retaliation by Defendant EPSD due to Plaintiff Mother and Plaintiff Father expressing the religious and disability discrimination that Plaintiff C.B and Plaintiff M.B. received at Defendant EPSD.

131.     On March 17, 2021, Plaintiff Mother emailed Dr. Pekarik and indicated that they had yet to receive the packets of materials or schoolwork for Plaintiff C.B. Plaintiff Mother further indicated that it is within Plaintiff C.B.'s IEP that he is to be given written materials as working off of a computer screen causes severe pain, eye, drift, and headaches for Plaintiff C.B.

132.     Plaintiff Mother further indicated that she had requested on numerous occasions to pick up the materials from the school, but she was never provided with an opportunity by Dr. Pekarik or other Defendant EPSD official to pick up the materials.

133.     Plaintiff Mother informed Dr. Pekarik that Plaintiff C.B. would need to go at his own pace until he can go back into school because he is no longer being provided in person tutoring services.

134.     Again, Defendant EPSD denied Plaintiff C.B. equal education opportunities by not providing the necessary help that was outlined within his IEP due to his disabilities.

135.     Around March 2021, Plaintiff C.B. would choose to attend school from home on certain days he was scheduled to be in person as he was having health issues that were exacerbated by the hostile and discriminatory environment created by Defendant EPSD.

136.     On March 19, 2021, Plaintiff Mother emailed Dr. Pekarik and indicated that they have repeatedly asked for Homebound learning since it first was put into place, they asked for assistance, and asked for an explanation as to why Plaintiff C.B. and Plaintiff M.B.'s IEP requirements were being violated by Defendant EPSD employees.

137.     On April 7, 2021, Plaintiff Mother received an email from Ms. Layton (First Name Unknown), Plaintiff C.B. and Plaintiff M.B.'s new Case Manager, inviting Plaintiff Parents to attend the students IEP meetings on April 9, 2021.

138.     Plaintiff Mother expressed her concern to Ms. Layton that there were too many people invited to attend the IEP and that they would be more comfortable with Dr. Pekarik being the only other individual within the meeting as they had discussed with their previous Case Manager, Mr. Remaly.

139.     Ms. Layton defied the agreement that was made between Plaintiff Mother, Plaintiff Father, and Mr. Remaly regarding who would attend the IEP meetings.

140.     On April 8, 2021, Dr. Pekarik reached out to Plaintiff Mother and indicated that the meeting needed to be cancelled due to a family emergency.

141.     Plaintiff Mother requested copies of the IEPs that were to be prepared and utilized during the meeting although it was cancelled.

142.     On April 14, 2021, Dr. Pekarik emailed Plaintiff Mother copies of Plaintiff C.B. and Plaintiff M.B.'s revised IEPs.

143.     Per previous discussions with Plaintiff Mother and officials of Defendant EPSD, the IEPs were to have been updated and changed since they were last prepared in February 2021.

144.     The IEPs that were sent to Plaintiff Mother were the same as those utilized in February 2021.

145.     Despite numerous requests for meetings, an update of the IEPs due to health issues, Defendant EPSD failed to make any changes to Plaintiff C.B. and Plaintiff M.B.'s IEPs.

146.     Plaintiff C.B. and Plaintiff M.B. were excluded from the opportunity to participate in their rightful education because Plaintiff Mother and Plaintiff Father expressed the religious discrimination that was taking place within Defendant EPSD.

147.     As a result of Plaintiffs voicing the religious discrimination that was occurring within Defendant EPSD, Defendant EPSD retaliated and further discriminated against Plaintiffs based on their disabilities.

148.     The retaliatory discrimination was severe, pervasive, and objectively offensive. The harassment was serious enough to have a systemic effect of denying Plaintiff C.B. equal access to an educational program.

149.     Plaintiffs complained to an official of Defendants who has authority to address the discrimination and to institute corrective measures on Defendants' behalf and said officials had knowledge of discrimination and failed to adequately respond.

150.     At all times material, Defendants acted with deliberate indifference to the discrimination.

151.     As a result of Defendant's discriminatory and intolerable treatment, Plaintiffs suffered severe emotional distress and physical ailments.

152.     Defendant EPSD acted willfully, deliberately, maliciously, with reckless disregard or deliberate indifference to the Plaintiffs' constitutional and statutory rights.

153.     The above are just some examples of unlawful discrimination and retaliation to

which the Defendant subjected Plaintiffs.

154.     Plaintiffs claim a continuous practice of discrimination and claims a continuing

violation and makes all claims herein under the continuing violations doctrine.

155.     Plaintiffs claim that Defendants discriminated against Plaintiffs because of their

religion, disabilities, and because they complained or opposed the unlawful conduct of

the Defendant.

156.     Plaintiff further claims aggravation, activation, and/or exacerbation of any

preexisting condition.


**FIRST CAUSE OF ACTION**
**DISCRIMINATION UNDER TITLE VI**
**20 U.S.C. § 1681, _et seq._**
**(asserted by Plaintiffs against Defendants East Penn School District)**


157.     Plaintiffs repeat and reallege each and every allegation made in the above paragraphs

of this complaint.

158.     Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, states

No person in the United States shall, on the ground of race, color, or national origin, be
excluded from participation in, be denied the benefits of, or be subjected to discrimination
under any program or activity receiving Federal financial assistance.

159.     The religion and race-based harassment articulated in the Plaintiffs' Statement of

Facts was so severe, pervasive, and objectively offensive that Plaintiffs C.B. and M.B. were

deprived of access to educational opportunities or benefits provided by the school.

160.     Defendant EPSD created and/or subjected Plaintiff C.B. and M.B. to a hostile

educational environment in violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000.

    a.  Plaintiff C.B. and Plaintiff M.B. were members of a protected class;

b. Plaintiff C.B. and Plaintiff M.B. were subjected religious and racial discrimination;

c. Plaintiff C.B. and Plaintiff M.B. were subjected to a hostile educational environment created by Defendant EPSD's lack of policies and procedure and failure to properly investigate and/or address the religious and racial discrimination and subsequent harassment and retaliation.

161.    Defendants EPSD and Emmaus High School forced Plaintiffs to participate in social educational activities that discriminated against them because of their race and religion.

162.    Defendant EPSD and its officials had actual knowledge of their employees posting discriminatory content on their social media accounts directed towards Christians and Catholics.

163.    Defendant EPSD, and it's officials had actual knowledge of religious and racial discrimination of Plaintiffs.

164.    Defendants' failure to promptly and appropriately respond to the religious and racial discrimination, resulted in Plaintiffs being excluded from participation in, being denied the benefits of, and being subjected to discrimination in Defendant EPSD's education programs in violation of Title VI.

165.    Defendants failed to take immediate, effective remedial steps to resolve the complaints of religious and racial discrimination and instead acted with deliberate indifference toward Plaintiffs.

166.    Defendants persisted in their actions and inaction even after they had actual knowledge of the harm suffered by Plaintiffs.

167.     Defendants engaged in a pattern and practice of behavior designed to discourage and dissuade students and parents of students who had been discriminated against because of their religion and/or race from seeking prosecution and protection, and from seeking to have their complaints be fully investigated.

168.     Defendants' retaliatory discrimination against Plaintiff Students prevented them from receiving equal access to education, making use of their disabilities to further subject them to undue hardship throughout the online learning environment.

169.     This policy and/or practice constituted disparate treatment of Caucasians and Catholics and had a disparate impact on Caucasian and Catholic students.

170.     Plaintiffs have suffered emotional distress and psychological damage as a direct and proximate result of Defendants' deliberate indifference to their rights under Title VI.

171.     Plaintiff C.B. and Plaintiff M.B. educational experiences were permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive so as to alter the conditions of their educational environment.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE CONSTITUTIONAL RIGHTS OF PLAINTIFF**
**UNDER 42 U.S.C.A. §1983**
**(asserted by Plaintiffs against all Defendants)**

172.     Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

173.     Plaintiffs' claims Defendants violated 42 U.S.C. § 1983, which states in pertinent part:

    Every person who, under color of any statute, ordinance, regulation,

    custom, or usage, of any State or Territory or the District of

> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress…

174.     The Fourteenth Amendment of the United States Constitution states in relevant part
that

> All persons born or naturalized in the United States, and subject to
> the jurisdiction thereof, are citizens of the United States and of the
> State wherein they reside. No State shall make or enforce any law
> which shall abridge the privileges or immunities of citizens of the
> United States; nor shall any State deprive any person of life, liberty,
> or property, without due process of law; nor deny to any person
> within its jurisdiction the equal protection of the laws.

175.     The First Amendment to the United States Constitution provides in relevant part
that: "Congress shall make no law respecting an establishment of religion, or prohibiting
the free exercise thereof . . . ."

176.     Plaintiffs C.B. and M.B. are minor students whom Defendants denied equal
protection of the laws by discriminating against them on the basis of their religion, and
therefore race, their disability, and retaliated against them for their opposition to the
discrimination.

177.     There is no important interest held by the Defendants in, inter alia, a) not allowing
Plaintiff's C.B. and M.B. to refrain from engaging in certain curriculum ; b) not requiring

Defendant Wilson to teach Plaintiff C.B. in a manner that protected both their interests; c) not acting in accordance with Plaintiff C.B. and Plaintiff M.B.'s IEPs d) not making any effort to locate an appropriate homebound instruct for Plaintiff C.B. ; e) not providing Plaintiff C.B. with printed work materials to continue his education while reducing screen time ; f) not allowing Plaintiff Parents an opportunity to speak with Plaintiff Childrens' teachers to adequately guide their education at home while online ; and g) not making reasonable accommodations to allow Plaintiff C.B. to continue his education at the same rate of his peers despite his disability in his IEP.

178.    Plaintiffs C.B. and M.B. were denied the right of equal access to education by way of discrimination on the basis of their race, religion, and disability.

179.    Plaintiff C.B. was not given reasonable options for accommodations of his disability that would allow him to stay on pace with his peers or conform with his IEP by allowing him to attend in person class without a mask, give him the correct amount of in person tutoring to supplement the online education, or give Plaintiff C.B. printed versions of his assignments to reduce screen time.

180.    Plaintiff M.B. was not given the opportunity to have her assignments adequately explained to her by her Spanish teacher and Plaintiff Parents were prohibited from contacting the teacher directly to understand and explain the assignments to their child at home.

181.    Each of the Defendants violated Plaintiffs C.B. and M.B.'s constitutional rights as set forth herein, including, but not limited to, equal protection under the law.

182.    Defendants violated the above section as set forth herein.

183.    Defendants violated 42 U.S.C.A. §1983 by not setting forth reasonable

accommodations for Plaintiffs C.B. and M.B. that would provide them with equal educational opportunities.

184.     Defendants further violated 42 U.S.C.A. §1983 by discriminating against Plaintiffs on the basis of their race and religion, forcing them learn in an environment with pervasive discrimination and resulting in emotional distress and unequal educational opportunities.

### AS A THIRD CAUSE OF ACTION
### VIOLATION OF § 504 OF THE REHABILITATION ACT OF 1973
### UNDER 29 U.S.C. § 794
### (asserted by Plaintiffs against all Defendants)

185.     Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

186.     § 504 of the Rehabilitation Act of 1973, under 29 U.S.C. § 794(a) provides that

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by . . . .

187.     EPSD and EHS, employing all Defendants individually named, is a public school district in Pennsylvania receiving federal financial assistance.

188.     Plaintiffs C.B. and M.B. are individuals with disabilities with IEPs who are qualified to complete their education.

189.     Defendants, by reason of Plaintiffs C.B. and M.B.'s disabilities, excluded Plaintiffs from participation in on campus instruction, denied Plaintiffs the benefit of an equal education, and subjected them to discrimination on the basis of their disabilities.

190.    Defendants denied Plaintiff C.B. from receiving in person instruction on the basis of his disability, which exempted Plaintiff C.B. from wearing a mask in class.

191.    Defendants refused to educate Plaintiff C.B. in person because of Plaintiff's mask exemption in his IEP.

192.    Defendants refused to provide reasonable accommodations to allow Plaintiff C.B. to continue his education at the pace of his peers, refused to provide him with the adequate home tutoring service to accommodate his online learning to comport with Plaintiff's IEP, and refused to provide printed materials to reduce Plaintiff C.B.'s screen time.

193.    Defendants shut off Plaintiff Parents from all communication with Plaintiffs C.B. and M.B.'s teachers which further created an unequal educational environment in which Plaintiff Parents would be able to coordinate with Defendant EPSD teachers on how to best help their children's online learning.

194.    Defendants' discriminatory actions against Plaintiffs resulted in poor grades in multiple classes for Plaintiff C.B. and M.B., both of whom were excellent students before the discriminatory actions.

195.    Defendants caused considerable delay in meeting to discuss Plaintiffs C.B. and M.B.'s IEPs, and attempted to intimidate Plaintiffs by inviting an unnecessary and overwhelming amount of staff to the IEP meeting.

196.    Plaintiff C.B. and M.B.'s educational experiences were permeated with discriminatory conduct on the basis of their disabilities that was sufficiently pervasive to deny them equal access to educational opportunities.

**AS A FOURTH CAUSE OF ACTION**
**VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT OF**
**1990**
**UNDER 42 U.S.C. § 12132**
**(asserted by Plaintiffs against all Defendants)**

197.     Plaintiffs repeat and reallege each and every allegation made in the above paragraphs

of this complaint.

198.     Title II of the Americans with Disabilities Act of 1990, under 42 U.S.C. § 12132,

provides that: "[N]o qualified individual with a disability shall, by reason of such disability,

be excluded from participation in or be denied the benefits of the services, programs, or

activities of a public entity, or be subjected to discrimination by any such entity."

199.     Plaintiffs C.B. and M.B. are individuals with disabilities with IEPs who are

qualified to complete their education.

200.     Defendants, by reason of Plaintiffs C.B. and M.B.'s disabilities, excluded Plaintiffs

from participation in on campus instruction, denied Plaintiffs the benefit of an equal

education, and subjected them to discrimination on the basis of their disabilities.

201.     Defendants denied Plaintiff C.B. from receiving in person instruction on the basis

of his disability, which exempted Plaintiff C.B. from wearing a mask in class.

202.     Defendants refused to educate Plaintiff C.B. in person because of Plaintiff's mask

exemption in his IEP.

203.     Defendants refused to provide reasonable accommodations to allow Plaintiff C.B.

to continue his education at the pace of his peers, refused to provide him with the adequate

home tutoring service to accommodate his online learning to comport with Plaintiff's IEP,

and refused to provide printed materials to reduce Plaintiff C.B.'s screen time.

204.     Defendants shut off Plaintiff Parents from all communication with Plaintiffs C.B.

and M.B.'s teachers which further created an unequal educational environment in which Plaintiff Parents would be able to coordinate with Defendant EPSD teachers on how to best help their children's online learning.

205.     Defendants' discriminatory actions against Plaintiffs resulted in poor grades in multiple classes for Plaintiff C.B. and M.B., both of whom were excellent students before the discriminatory actions.

206.     Defendants caused considerable delay in meeting to discuss Plaintiffs C.B. and M.B.'s IEPs, and attempted to intimidate Plaintiffs by inviting an unnecessary and overwhelming amount of staff to the IEP meeting.

207.     Plaintiff C.B. and M.B.'s educational experiences were permeated with discriminatory conduct on the basis of their disabilities that was sufficiently pervasive to deny them equal access to educational opportunities.

## **JURY DEMAND**

Plaintiffs request a jury trial on all issues to be tried.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

**DEREK SMITH LAW GROUP, PLLC**

By: ___*/s/ Catherine W. Smith, Esq.*___
                    Catherine W Smith, Esquire
                    1835 Market Street, Suite 2950
Dated: June 14, 2021            Philadelphia, Pennsylvania 19103